22CA1019 Peo v Berumen 04-10-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1019
Pueblo County District Court No. 18CR1286
Honorable Allison P. Ernst, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Francisco Manuel Berumen,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Brown and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 10, 2025

---

Philip J. Weiser, Attorney General, Brian M. Lanni, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Daniel J. Sequeira, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Francisco Manuel Berumen, appeals the judgment of conviction entered on jury verdicts finding him guilty of aggravated motor vehicle theft, vehicular assault, and careless driving resulting in injury. We affirm.

## I.     Background

¶ 2     Berumen fell asleep one morning while driving a Chevy Trailblazer that he'd stolen the night before. The Trailblazer drifted into oncoming traffic and collided head-on with G.B.'s car while G.B. was on her way to church.

¶ 3     Based on this incident, the People charged Berumen with aggravated motor vehicle theft, driving under the influence (DUI), vehicular assault (reckless), vehicular assault (DUI), and careless driving resulting in injury. After a bifurcated trial, the jury acquitted Berumen of DUI and vehicular assault (DUI) but found him guilty of the remaining charges. The district court sentenced him to a term of two years in community corrections.

## II.     Discussion

¶ 4     Berumen contends that the district court erred by (1) refusing to suppress his statements to the police at the scene of the crash; (2) admitting irrelevant and prejudicial evidence that G.B. had been

1

on her way to church; (3) allowing the prosecution's expert witness to testify outside the scope of his anticipated testimony; and (4) denying defense counsel's tendered implicit bias instruction. He also contends that the cumulative effect of these alleged errors warrants reversal. We address and reject each of these contentions in turn.

### A. Berumen's Statements to the Police

#### 1. Additional Facts

¶ 5 When Corporal Maize arrived at the scene of the crash, he saw Berumen lying on the sidewalk near bystanders and pleading for help. Corporal Maize assured Berumen that rescue personnel were on the way and asked him for his name and date of birth, which Berumen provided. Corporal Maize then asked Berumen what had happened, to which Berumen answered that he had fallen asleep while driving. An ambulance arrived, and emergency medical technicians (EMTs) began treating both G.B. and Berumen. Corporal Maize left the EMTs with Berumen and talked to eyewitnesses about the crash.

¶ 6 Several minutes later, Corporal Timme approached Berumen and asked him what had happened. At this point, Berumen — who

was now wearing a neck brace — said that he had fallen asleep at the wheel, hadn't slept in days, and was homeless. Corporal Timme asked him who owned the Chevy Trailblazer. Berumen said he didn't know and that he'd stolen it from someone because he was tired of walking and was cold. Corporal Timme also asked Berumen if he'd taken any illegal drugs, to which Berumen replied that he had smoked methamphetamine sometime before midnight and had warrants out for his arrest. As of this point, neither officer had told Berumen that he was under arrest or was not free to leave. After EMTs finished treating Berumen, Corporal Timme arrested him.

¶ 7    Before trial, defense counsel moved to suppress Berumen's statements to Corporals Maize and Timme. The district court denied the motion following an evidentiary hearing. Neither officer told Berumen during the conversations that he was under arrest or not free to leave.

## 2.    Standard of Review

¶ 8    A district court's ruling on a motion to suppress involves questions of both fact and law. *People v. Davis*, 2019 CO 24, ¶ 14. We defer to the district court's factual findings if the record supports them but review its legal conclusions de novo. *People v.*

3

*Cooper*, 2016 CO 73, ¶ 7; *see People v. Begay*, 2014 CO 41, ¶ 9 (whether a suspect is in custody is a legal question we review de novo (citing *People v. Matheny*, 46 P.3d 453, 459 (Colo. 2002))).

### 3.     Analysis

¶ 9     Berumen contends that the district court should have suppressed his statements to Corporals Maize and Timme because he made them without the benefit of *Miranda* warnings and involuntarily.  We disagree.

#### a.     *Miranda* Warnings

¶ 10     The Fifth Amendment to the United States Constitution provides that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "In order to protect this right, police must provide a suspect in custody with certain warnings before subjecting him or her to interrogation."  *People v. Holt*, 233 P.3d 1194, 1197 (Colo. 2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)).

¶ 11     *Miranda* warnings apply only when a suspect is subject to custodial interrogation.  The People don't contest that Berumen was interrogated, so we'll assume he was for the purposes of our

4

*Miranda* analysis. We therefore focus our inquiry on whether Berumen was in custody when he made his statements.

¶ 12    A person is in custody for *Miranda* purposes if, under the totality of the circumstances, "a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Effland v. People*, 240 P.3d 868, 874 (Colo. 2010) (quoting *People v. Hankins*, 201 P.3d 1215, 1218 (Colo. 2009)); *accord Matheny*, 46 P.3d at 468. We consider a wide range of factors, with no single factor being determinative. *Matheny*, 46 P.3d at 466. As relevant in this case, these factors include the location and purpose of the encounter, the persons present, the words spoken by the officer and defendant, the officer's tone of voice and demeanor, and the level of restraint police placed on the defendant. *Id.* at 465-66.

¶ 13    We reject Berumen's assertion that he was in custody at the scene of the crash due to his injuries and inability to leave. The balance of factors shows that Berumen wasn't in custody during his interactions with Corporals Maize and Timme. The police arrived in response to a car crash and needed to ask witnesses — including Berumen — questions to get a sense of what had happened. Both

officers used a friendly and conversational tone with Berumen on the sidewalk several feet away from the crashed vehicles. Corporal Maize's questioning didn't last long, and Berumen wasn't restrained. Corporal Maize repeatedly told him that medical help was on the way; when help arrived, he left Berumen in the care of the EMTs for assessment and treatment. While Corporal Timme's questioning lasted longer, his encounter with Berumen was in public and his tone was conversational. At no time before Corporal Timme arrested Berumen did either officer tell him that he was under arrest or not free to leave. Thus, a reasonable person in Berumen's situation would not have believed he was deprived of his freedom of action to the degree associated with a formal arrest when he was being questioned by the officers.

¶ 14    Relying on *Effland*, Berumen argues that he was in custody because he was "in a largely immobile state for medical reasons unrelated to police conduct." *Effland*, 240 P.3d at 876. But in *Effland*, the ununiformed police officers escorted the suspect to the hospital, closed the door to his hospital room, stationed a uniformed officer on the other side of the door, and questioned the suspect despite his repeated attempts to end the questioning and

6

speak to an attorney. *Id.* at 875. Berumen, on the other hand, was on the sidewalk in public with witnesses nearby, was treated for several minutes without a police officer present, and never requested an end to questioning or to speak to an attorney. Importantly, the supreme court in *Effland* weighed "mobility [that] was limited for medical reasons unrelated to police conduct" *against* a finding of custody. *Id.* Berumen's injuries limiting his mobility were the result of his own conduct.

¶ 15 In sum, because Berumen wasn't in custody when he made the statements in question, there was no *Miranda* violation.

### b. Voluntariness

¶ 16 Regardless of Berumen's custodial status, his statements to the police weren't admissible for any purpose if they were involuntary. *People v. Coke,* 2020 CO 28, ¶ 17; *Effland,* 240 P.3d at 877. "To be voluntary, a statement must be the product of an essentially free and unconstrained choice by its maker." *People v. Ramadon,* 2013 CO 68, ¶ 19 (citing *People v. Raffaelli,* 647 P.2d 230, 234 (Colo. 1982)).

¶ 17 As an initial matter, we agree with the People that this issue isn't preserved. Berumen's counsel included a bare boilerplate

assertion in the motion to suppress that "[a]ny and all statements made by Mr. Berumen were involuntary and their evidentiary use would violate the right against self incrimination and to due process[.]" But such a generic motion doesn't preserve an issue for appeal. *Phillips v. People*, 2019 CO 72, ¶ 12 (merely advancing a "conclusory, boilerplate contention" doesn't suffice to preserve a suppression issue for appeal (quoting *People v. Samuels*, 228 P.3d 229, 238 (Colo. App. 2009))). And Berumen's counsel didn't seek a ruling on this issue by the district court. (Indeed, the issue never came up at the hearing on the motion.) Thus, we review any error for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14 (plain error is error that is obvious and that so undermined the fundamental fairness of the trial as to cast serious doubt on reliability of the judgment of conviction).

¶ 18    Determining whether Berumen's statements were voluntary requires a two-step inquiry. *Ramadon,* ¶ 20. First, there must have been coercive police conduct. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Second, that conduct must have played a significant role in inducing the statements — that is, it must have been sufficient to overbear the defendant's will. *Id.* We review both

8

a "defendant's ability to resist coercive pressures and the nature of the police conduct, using a nonexclusive list of factors when making a voluntariness determination." *Id.*

¶ 19    Berumen asserts that he made his statements involuntarily because Corporals Maize and Timme coerced him into answering their questions and he had no ability to resist their coercive pressure. But he doesn't point to any coercive measures the officers used against him. Each of the following facts weighs against a finding of involuntariness:

- Berumen wasn't in custody, and although he couldn't physically leave given his injuries, he could have terminated the interrogation and made no attempt to do so. *See People v. Gennings*, 808 P.2d 839, 845 (Colo. 1991) (a defendant free to leave the room at any time isn't in custody).

- The police never threatened or promised Berumen anything, apart from Corporal Maize's accurate assurance that medical help was on the way. *Cf. People v. Medina*, 25 P.3d 1216, 1226-27 (Colo. 2001) (a police threat can play a significant role in inducing statements).

- Contrary to Berumen's assertion that the police withheld medical care until they finished interrogating him, Corporal Maize merely asked him what had happened and walked away once EMTs began their treatment. Corporal Timme arrived after a few minutes, giving EMTs an opportunity to treat Berumen, and Corporal Timme didn't stop EMTs from treating Berumen while he was questioning him.

- As discussed above, the interrogation was conducted in a conversational and polite manner. *Cf. Ramadon*, ¶ 25 (accusatory questioning and threats of repercussions may be coercive).

- The interrogation was in public with eyewitnesses standing by. *Cf. Effland*, 240 P.3d at 876 (officers coerced Effland by placing themselves between him and the only exit).

- To the extent Berumen asserts that he was in a vulnerable state because he'd just crashed the SUV, was in serious pain, hadn't slept in days, was homeless, and was addicted to drugs, there is no indication in the

record that the officers took advantage of his vulnerable state to coerce his statements.

¶ 20 In sum, we conclude that (1) Corporals Maize and Timme weren't required to give Berumen *Miranda* warnings before questioning him because he wasn't yet in custody, and (2) Berumen made his statements voluntarily. Accordingly, the district court didn't err by not suppressing his statements.

### B. Evidence that G.B. Was on Her Way to Church

¶ 21 Berumen next contends that the district court reversibly erred by admitting evidence that G.B. was on her way to church when Berumen crashed into her. We disagree.

### 1. Additional Facts

¶ 22 Before trial, defense counsel moved to exclude evidence that G.B. was headed to church when Berumen drove into her car because that evidence was irrelevant and prejudicial. The prosecutor sought to admit this evidence as part of the case's narrative and because it went to G.B.'s credibility as a witness. The district court denied defense counsel's motion, reasoning that the evidence didn't necessarily give rise to an inference that G.B. was a good person. But the court told the prosecutor, "I don't expect you

11

to highlight that testimony, you know, unduly. You can ask her where she was going, certainly, but I wouldn't spend a lot of time."

¶ 23 At trial, the prosecutor mentioned that G.B. was on her way to church five times: twice during his opening statement, twice during G.B.'s testimony, and once during his closing argument.

## 2. Standard of Review

¶ 24 "Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact." *People v. Elmarr*, 2015 CO 53, ¶ 20. We review a trial court's evidentiary ruling for an abuse of that discretion. *Nicholls v. People*, 2017 CO 71, ¶ 17. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or is based on a misunderstanding or misapplication of the law. *People v. Thompson*, 2017 COA 56, ¶ 91.

¶ 25 Because this evidentiary challenge is preserved, we review any error for harmlessness. *See Hagos*, ¶ 12. An error is harmless unless it "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)). We consider the entire record and "review several factors, including the overall strength of the

prosecution's case, the importance of the evidence to the prosecution's case, [and] the impact of the improperly admitted evidence on the jury." *People v. Springsted*, 2016 COA 188, ¶ 66 (citing *Merritt v. People*, 842 P.2d 162, 169 (Colo. 1992)).

### 3.    Analysis

¶ 26    Berumen argues that evidence that G.B. was on her way to church was irrelevant and highly prejudicial because several potential jurors referenced their Christian backgrounds during voir dire.  But even if we assume, without deciding, that the court erred by admitting this evidence, we conclude that any error was harmless for the following four reasons.

¶ 27    First, the prosecutor's references to G.B. going to church were brief and fleeting, and he followed the court's ruling not to unduly highlight the fact.  He referenced the evidence only to indicate where G.B. was going when Berumen crashed his car into hers; he never implied that G.B. was a good person or sympathetic victim because she had been on her way to church.

¶ 28    Second, the court properly instructed the jurors that they "must not be influenced by sympathy, bias, or prejudice in reaching [their] decision," which cuts against any conclusion that sympathy

13

or prejudice played a role in their verdicts. *See Washington v. People*, 2024 CO 26, ¶ 31 (we presume that the jury understood and followed the district court's instruction).

¶ 29 Third, the jury acquitted Berumen of DUI and vehicular assault (DUI), which indicates that it wasn't persuaded by improper motivations like sympathy for G.B. *See Martin v. People*, 738 P.2d 789, 795-96 (Colo. 1987) (the jury's inability to reach a verdict on a third count indicated that the jurors didn't improperly convict on the other counts).

¶ 30 Finally, substantial, properly admitted evidence supported Berumen's convictions. *See Washington*, ¶ 27. That evidence included body camera footage of Berumen's inculpatory statements and video footage of the crash from a nearby business.

## C. Expert Witness Disclosure

¶ 31 Berumen next contends that the district court erred by allowing the prosecution's expert witness to testify beyond the scope of his anticipated testimony without requiring the prosecution to tender an expert report or summary of the testimony to defense counsel as required by Crim. P. 16(I)(d)(3). Again, we disagree.

## 1. Additional Facts

¶ 32 Before trial, the prosecution notified Berumen's attorney that Dr. Imlay — an emergency room surgeon who had treated G.B.'s injuries — would testify as an expert witness. At a pretrial hearing, defense counsel said she expected Dr. Imlay to testify about the serious bodily injury (SBI) element of the vehicular assault charge but would object to any testimony beyond the scope of SBI absent a report under Rule 16(I)(d)(3). The prosecutor indicated he didn't plan to go beyond SBI with that witness. The district court said that Dr. Imlay would not be allowed to testify beyond SBI unless the prosecution provided defense counsel with a written summary of Dr. Imlay's expected testimony.

¶ 33 When Dr. Imlay testified at trial, Berumen's counsel objected, contending that his testimony should be limited to "the SBI form itself," not "the extent of [G.B.'s] injuries, what the injuries are, [or] any of that." Counsel reasoned that she wasn't on notice of the content of Dr. Imlay's expected testimony because the prosecution hadn't provided her with a summary. The court concluded that because the prosecution provided medical records of G.B.'s injuries

15

to Berumen's counsel during discovery, the prosecutor could ask about the injuries.

¶ 34 The prosecutor then asked Dr. Imlay whether, if G.B. "continued to bleed, without going to surgery, the end result would have been death?" Dr. Imlay answered, "Yes. . . . [S]he was not going to survive if we didn't take her back to surgery."

### 2. Standard of Review and Applicable Law

¶ 35 We review a district court's decision to admit expert testimony for an abuse of discretion. *Kutzly v. People*, 2019 CO 55, ¶ 8.

¶ 36 District courts have the discretion to "order the prosecution to disclose underlying facts or data supporting the opinion in that particular case of an expert endorsed as a witness." Crim. P. 16(I)(d)(3). The rule allows the court to order a summary of the "testimony describing the witness's opinions and the bases and reasons therefor." *Id.*

### 3. Analysis

¶ 37 Berumen argues that the district court erred by allowing Dr. Imlay to testify about what might have happened if G.B. hadn't received medical treatment. We reject this argument.

¶ 38    Dr. Imlay's testimony about G.B.'s injuries directly related to the SBI issue that defense counsel conceded was within the proper scope of his testimony, and for which no additional report or summary was needed.  At the pretrial hearing, counsel said, "I suspect [Dr. Imlay] is going to testify to SBI, and if that's the extent of his testimony, I don't really have an objection to that."  And, as the district court pointed out, defense counsel had access to the medical records to which Dr. Imlay testified.  Contrary to Berumen's assertion, the district court never limited Dr. Imlay's testimony to the SBI form itself.[1]

¶ 39    Dr. Imlay's testimony was relevant to the jury's determination of whether — as it related to the vehicular assault charge — Berumen was "the proximate cause of serious bodily injury to another."  § 18-3-205(1)(a), C.R.S. 2024.  Section 18-1-901(3)(p), C.R.S. 2024, defines serious bodily injury as follows:

> "Serious bodily injury" means bodily injury that, either at the time of the actual injury or at a later time, involves a substantial risk of death; a substantial risk of serious permanent disfigurement; a substantial risk of protracted loss or impairment of the function of any part

---

[1] An SBI form is a medical letter from a doctor indicating the extent of injuries.  *See generally People v. Vigil*, 2021 CO 46, ¶¶ 6-8.

or organ of the body; or breaks, fractures, a penetrating knife or penetrating gunshot wound, or burns of the second or third degree.

Therefore, we conclude that the prosecutor's question whether G.B.'s injuries, if left untreated, would have resulted in her death was within the scope of Dr. Imlay's anticipated SBI testimony.

### D.    Implicit Bias Instruction

¶ 40    Berumen contends that the district court erred by rejecting defense counsel's tendered implicit bias jury instruction. We disagree.

### 1.    Additional Facts

¶ 41    Berumen's counsel tendered an implicit bias jury instruction that he contends would have addressed "bias against homeless drug users" and "the fact that the victim. . . was headed towards church." That proposed instruction read as follows:

> Growing scientific research indicates each one of us has "implicit biases" or hidden feelings, perceptions, fears and stereotypes, in our subconscious. These hidden thoughts often impact how we remember what we see and hear and how we make important decisions. While it is difficult to control one's subconscious thoughts, being aware of these hidden biases can help counteract them. As a result, I ask you to recognize that all of us may be affected by implicit biases in the decisions

we make. Because you are making very important decisions in this case, I strongly encourage you to critically evaluate the evidence and resist any urge to reach a verdict influenced by stereotypes, generalizations, or implicit biases.

¶ 42    The district court rejected the instruction because it wasn't a standard instruction, and the bias issue was sufficiently addressed by the COLJI-Crim. E:01 (2020) "instruction that sympathy and prejudice cannot affect your decision as a juror."

## 2.    Standard of Review

¶ 43    "We review jury instructions de novo, as a whole, to determine whether they accurately informed the jury of the governing law." *People v. Toro-Ospina*, 2023 COA 45, ¶ 41 (citing *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011)).  But we review a district court's decision whether to give a particular instruction for an abuse of discretion.  *Id.*

## 3.    Analysis

¶ 44    Berumen argues that defense counsel's tendered jury instruction was necessary because the jurors harbored implicit bias against him as a Hispanic man who was homeless and addicted to drugs.  We disagree.

19

¶ 45    A division of this court addressed a similar implicit bias instruction in *Toro-Ospina*.  The division determined that the district court wasn't required to inform the jury about implicit bias after the defendant testified with the help of a translator in his native language.  *Id.* at ¶¶ 44-48.  The division reasoned that it was within the district court's discretion to choose whether to provide the instruction because neither the General Assembly nor the Colorado Supreme Court has required one.  *Id.* at ¶ 47; *see also Vigil v. People*, 2019 CO 105, ¶ 14 (a district court doesn't abuse its discretion if its decision falls "within a range of reasonable options").[2]

¶ 46    We agree with the division's reasoning in *Toro-Ospina*.  Moreover, Berumen's tendered instruction was more problematic than the instruction in *Toro-Ospina*, which read, "Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.  Like conscious bias, unconscious

---

[2] After Berumen's trial, an *optional* implicit bias instruction was added to the model instructions.  COLJI-Crim. B:01, E:01 cmts. 2 and 11 (2024).

bias can affect how we evaluate information and make decisions." *Toro-Ospina*, ¶ 42. Berumen's proposed instruction referenced scientific research that hadn't been introduced at trial, and it implied that the court was seeking a personal favor by instructing the jury, "I strongly encourage you . . . ." And contrary to Berumen's assertion, the fact the prospective jurors didn't discuss unconscious bias during voir dire (as it was in *Toro-Ospina*) didn't require the district court to instruct the jury on the topic.

## E.    Cumulative Error

¶ 47    Because we've identified only one possible error, the cumulative error doctrine isn't implicated. *See People v. Thames*, 2019 COA 124, ¶ 69 ("[A] single error is insufficient to reverse under the cumulative error standard.").

## III.    Disposition

¶ 48    The judgment is affirmed.

JUDGE BROWN and JUDGE YUN concur.

21